SMITH PATTEN
SPENCER F. SMITH, ESQ. (SBN: 236587)
DOW W. PATTEN, ESQ. (SBN: 135931)
353 Sacramento St., Suite 1120
San Francisco, California 94111
Telephone (415) 402-0084
Facsimile (415) 520-0104

Attorneys for Plaintiff
NICOLE SHAW-OWENS

SFSU STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE SHAW-OWENS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>THE BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY, D.B.A. SAN FRANCISCO STATE UNIVERSITY,<br><br>Defendant. | Case No. C13-2627<br><br>**COMPLAINT FOR DAMAGES**<br><br>(1) **DISABILITY DISCRIMINATION ADA (42 U.S.C. SECTION 1201**, *et seq.*)<br>(2) **DISABILITY DISCRIMINATION** (Cal. Gov. Code § 12900, et seq.)<br>(3) **FAILURE TO ACCOMODATE** (Cal. Gov. Code § 12900, et seq.)<br>(4) **FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS** (Cal. Gov. Code § 12900, et seq.)<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, NICOLE SHAW-OWENS, files this Complaint, and complains of the named Defendants, and each of them, jointly and severally, and for causes of action, alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. 1331 for Plaintiff's federal claims. The Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. 1367 because the state law claims arise out of the same transactions.

COMPLAINT - 1

2. Venue is proper in this Court as the acts complained of occurred in the City and County of San Francisco, Defendant BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY, D.B.A. SAN FRANCISCO STATE UNIVERSITY (hereinafter "Defendant" or "SFSU") does business in the City and County of San Francisco. And Plaintiff has been damaged in excess of the jurisdictional amount of this Court.

## INTRODUCTION

3. This is an actions for damages for Disability Discrimination, Retaliation, Failure to Engage in the Interactive Process. This Action arises out of events involving Plaintiff NICOLE SHAW-OWENS (hereinafter "Plaintiff" or "Ms. Shaw-Owens") employment at SFSU.

## THE PARTIES

4. Plaintiff is an individual formerly employed by SFSU as a Human Resources Operations and Risk Management Manager.

5. Plaintiff is informed and believes and therefore alleges that Defendant SFSU is a California institute doing business in the City and County of San Francisco and Tiburon, California.

6. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1-10, inclusive, and Plaintiff therefore sues such defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences, acts and omissions alleged herein and that Plaintiffs injuries as alleged herein were proximately caused by such aforementioned defendants.

## FACTS COMMON TO ALL CAUSES OF ACTION

7. In or around 2008 Ms. Plaintiff, Nicole Shaw-Owens, was actively pursued for employment by Associate Vice President of Human Resources Safety and risk Management ("HRSRM").

8. Prior to accepting the position, Ms. Shaw-Owens' reviewed the terms and conditions of her employment and due to her experience and expertise level within the field, she informed Ms.

Gentles that she would accept if they could offer a higher salary. Ms. Gentles accommodated Ms. Shaw-Owens' requests and offered her an increase in salary, to which Ms. Shaw-Owens then accepted the position.

9. In or around December of 2008, Defendant offered Ms. Shaw-Owen's the position of Change and Budget Manager within the Safety and Risk Management Environmental Health and Safety department at San Francisco State University by Lori Gentles, the Associate Vice President of Human Resources.

10. On January 12, 2009 Ms. Shaw Owens began as Change and Budget Manager at SFSU reporting directly to Ms. Gentles.

11. Ms. Shaw-Owens' job responsibilities included providing support to and working collaboratively with the HRSRM Staff to help develop and improve internal and external controls and processes. It was Ms. Shaw-Owens 'specific job to identify areas of weakness within Human Resources, the Labor Department and Risk Management and develop improvement strategies for each.

12. Within the first several weeks, Ms. Shaw-Owens identified an inordinate amount of money being spent toward hazardous waste disposal. The budget for waste allocation was approximately $227,411.00 and SFSU was spending over a million dollars for approximately 7 years.

13. Immediately after her discovery, Ms. Shaw-Owens reported her findings to Ms. Gentles and requested authorization to further investigate the matter. Ms. Gentles granted the authorization and soon thereafter, it was discovered that Robert Shearer, Environmental Health Occupational Safety Director, and Michael Martin, Executive Director of Risk Management, were responsible for signing off on the invoices for the waste disposal, including a payment of $400,000 right before Ms. Shaw-Owens was hired.

14. The issue quickly escalated to the University's attention and required the attention of the school President, Legal Counsel, The CSU Chancellor and the Chief of Police for all of CSU.

15. Soon thereafter, Mr. Martin's sign-off authority on payments such as the MPP contract were revoked by Ms. Gentles. For the first time in 15 years Ms. Shaw-Owens reduced the amount of money spent on waste disposal to finally fall within the allocated budget.

16. As a direct result of some of Mr. Martin's authority being revoked, the HRSRM department called for a restructure which became effective in or around July of 2011.

17. Subsequently to the restructure of the department, Mr. Martin became Ms. Shaw-Owens' direct supervisor.

18. Soon after the restructure, Ms. Shaw-Owens was given the directive to accompany an appraiser during a campus-wide property appraisal. Upon review of the paperwork following the appraisal, Ms. Shaw-Owens discovered that SFSU was paying double the insurance payments on property. For example, Ms. Shaw-Owens recognized that the student union building, which was appraised at a value of $4 million dollars, was being insured twice by the college.

19. For the next two years, between the end of 2009 and 2011, Ms. Shaw-Owens worked diligently to bring financial stability and industry-standard controls to Labor, Risk Management, HR departments, and ORSP of SFSU, competently performing her duties and receiving positive performance feedback and accolades internally and externally.

20. In October of 2011 Ms. Shaw-Owens was diagnosed and notified SFSU then that she had a serious medical condition requiring invasive surgery and recovery. Almost immediately after being informed of her medical condition, Mr. Martin began questioning Ms. Shaw-Owen's attendance.

21. On November 9, 2011 Ms. Shaw-Owens wrote to her supervisor, Michael Martin, regarding her prior notification to request for time off for the remainder of the day to take her husband to a series of appointments. Ms. Shaw Owens also informed Mr. Martin that she had worked additional hours outside the scope of the normal business hours including weekends and Veterans day and her requested time off was never an issue in the past. Mr. Martin's response to Ms. Shaw-Owens' e-mail was that exempt employees must work weekends and nights at times and that it doesn't excuse them from requesting time off. Nonetheless, Ms. Shaw-Owens took his

COMPLAINT - 4

advice and made sure to document her requests more concretely in the future to avoid any confusion.

22. On February 13, 2012 Michael Martin met with Ms. Shaw-Owens. In this meeting, Mr. Martin addressed a number of concerns with Ms. Shaw-Owens. He stated that a day the previous week that he was unable to "find her" on campus. Mr. Martin accused Ms. Shaw-Owen's of lying that she informed anyone of her leave of the campus. Also in this meeting Mr. Martin expressed his concerns with Ms. Shaw-Owens about completing pending projects and budget activities in a timely manner. Mr. Martin alleged that the previous year, all projects were not submitted in a timely manner. At this time, Mr. Martin made the unilateral decision to reassign Ms. Shaw-Owens duties as he allegedly had "lost all confidence" in her ability to perform Risk Management responsibilities. The last thing Mr. Martin noted was that he requested Ms. Shaw-Owens to schedule her doctor's appointments around their meetings. Mr. Martin memorialized this meeting in an e-mail he sent that same day.

23. The following day Ms. Shaw-Owens wrote an e-mail in response to Mr. Martin's mischaracterizations of their conversation. Ms. Shaw-Owens responded about her leave from campus the previous week was on a Wednesday not a Thursday and it was for a personal emergency medical reason. Ms. Shaw-Owens even voluntarily provided medical documentation to Mr. Martin. She continued that while she was out of the office, she was in constant communication with the department. She also reiterated the "reassignment" they discussed during the meeting isn't how he represented it in his e-mail. Ms. Shaw-Owens disagreed that the people proposed to offer support for her projects were adequately trained and the proposal would not result in an increase in productivity, but rather the opposite, as she would have to engage in substantial training and correction of their errors. Although Mr. Martin effectively removed all of Ms. Shaw-Owens' risk responsibilities except for Risk Finance, Ms. Shaw-Owens did not immediately complain of the unfair treatment.

24. Shortly thereafter, on February 20, 2012, Michael Martin wrote an e-mail to Ms. Shaw-Owens regarding the Presidential Recruitment Committee Meeting she scheduled. Mr. Martin reminded Ms. Shaw-Owens that he lacked confidence in her ability to accomplish her tasks in a

COMPLAINT - 5

timely manner and instructed her to forfeit the meeting and attend to her work. Included in this e-mail was a list of Mr. Martin's expectations of her that day. Shocked by this unwarranted and unnecessary heightened scrutiny, Ms. Shaw-Owens forwarded the email to Lori Gentles requesting an immediate meeting to address the concerns raised in Mr. Martin's e-mail. Ms. Shaw-Owens continued that it was becoming apparent that Mr. Martin did not want to work with her, the relationship has become toxic and that she felt the e-mails were becoming a form of harassment.

25. Nonetheless, Ms. Shaw-Owens responded that same day to Mr. Martin's email in which she agreed that there are more pressing matters within the office to handle rather than attend the Presidential Recruiting Committee Meeting. In the e-mail Ms. Shaw-Owens addressed Mr. Martin's concerns and informed him that she will keep him updated.

26. In response to Mr. Martin's unwarranted and excessive scrutiny of Ms. Shaw-Owen's work, Ms. Shaw-Owens pushed off her necessary surgery, to the detriment of her health, out of a reasonable fear that Mr. Martin would further retaliate against her for taking protected medical leave.

27. The unwarranted and unnecessary scrutiny by Mr. Martin was clearly overreaching. For example, later that day, Ms. Shaw-Owens addressed an inquiry from Mr. Martin concerning an outstanding invoice by XYZ Flooring. Ms. Shaw-Owens informed Mr. Martin of his error, that the estimate was sent to accounting for payment processing in error, as it was not an invoice.

28. Between February 20, 2012 and February 22, 2012, Ms. Shaw-Owens and Mr. Martin exchanged a series of e-mails regarding a meeting Mr. Martin requested. For purposes of clarification, Ms. Shaw-Owens asked where the meeting would take place as the meeting places tend to change from time to time.

29. Mr. Martin responded quickly to Ms. Shaw-Owens that all meetings are expected to be in his office. When Ms. Shaw-Owens explained why she thought it may have been in a different location, he aggressively responded with a series of questions designed to belittle and intimidate Ms. Shaw-Owens.

30. After the meeting, Mr. Martin wrote an e-mail to Ms. Shaw-Owens informing her that she can respond to his questions verbally. He also suggests that Ms. Shaw-Owens provide responses to him within one business day unless the matter being discussed is urgent. Mr. Martin reiterated in his e-mail from the meeting that non-responsiveness is unprofessional and disrespectful.

31. In stark contrast to Mr. Martin's overreaching heightened and harassing scrutiny of Ms. Shaw-Owen's work, SFSU a week later presented a substantial kudos to Ms. Shaw-Owens. In recognition of Ms. Shaw-Owens' work in helping reduce the hazardous waste disposal expenditures by eliminating inappropriate charges, Vice President and SFO, Nancy Hayes approved a one-time lump sum MPP Merit Bonus to be awarded to Ms. Shaw-Owens' on March 1, 2012.

32. On March 1, 2012, Ms. Shaw-Owens informed Human Resources Associate Vice President, Lori Gentles that she would be unable to attend the regularly scheduled meeting on March 5th due to a minor medical procedure.

33. In a letter dated, Friday March 9, 2012, Lori Gentles wrote to Ms. Shaw-Owens informing her that effective April 1, 2012 SFSU elected to "no longer retain" Ms. Shaw-Owens in her position as Human Resources Operations and Risk Management Manager. This letter offered another position as a Human Resources Safety and Risk Management Budget Coordinator ("HRSRM Budget Coordinator"), a significant demotion from her previous position, both monetary and in stature.

34. Under the demotion to the position of HRSRM Budget Coordinator due to the elimination of her position, the reduced annual salary would be $65,000 and would require Ms. Shaw-Owens to continue reporting to Mr. Martin.

35. Beginning Monday March 12, 2012 Ms. Shaw-Owens was instructed by her doctor to be off of work prior to her scheduled surgery due to the debilitating abdominal pain she was experiencing.

36. On March 21, 2012 Ms. Shaw-Owens notified Mr. Martin that her surgery was further pushed back to April 13, 2012 due to her unexpected elevation in blood pressure and continuous

pain. Ms. Shaw-Owens informed Mr. Martin that she was unable to return to work and would require an extension of medical leave.

37. On March 22, 2012 Mr. Martin responded to Ms. Shaw-Owen's e-mail and states that her medical note dated March 19, 2012 indicates her return to full duty by March 22, 2012. He requested she provide a medical extension to him no later than March 26, 2012.

38. Ms. Shaw-Owens scheduled an appointment with her doctor the following day, March 23, 2012, to provide a note to SFSU and extend her medical leave until April 13, 2012. Ms. Shaw-Owens then faxed the verification and included her handwritten notes that she will provide an update to SFSU regarding her return to the office as soon as they schedule her surgery.

39. Since Ms. Shaw-Owens extended her medical leave, the Payroll and Leave Program analyst reminded Ms. Shaw-Owens on March 27, 2012 that her available sick leave will run out on March 28, 2012 and offered her alternative options: non-industrial disability leave, leave of absence without pay, or request to use vacation hours.

40. On March 27, 2012, Ms. Shaw-Owens received a letter from Ellen Lo again regarding FMLA leave. She informed her that she is eligible for FMLA for a maximum of 12 weeks of unpaid leave in a 12-month period based upon medical verification and had been placed on FMLA leave from March 12, 2012 to April 13, 2012.

41. On April 1, 2012 Ms. Shaw-Owens was effectively terminated.

42. On April 6, 2012 Ms. Shaw-Owens received a partial final payment, only to receive the remainder of her final pay on September 6, 2012.

43. Realizing that her medical condition would not be accommodated by SFSU and that the demotion she suffered would not be remedied, on April 8, 2012, Ms. Shaw-Owens applied for Unemployment benefits.

44. On April 12, 2012, Mr. Martin wrote to Ms. Shaw-Owens regarding her final pay, asking her to return her university keys and gather her personal belongings by April 20, 20122.

45. On or about April 13, 2012, Ms. Shaw-Owens underwent major surgery with a successful outcome.

46. On January 20, 2013, Ms. Shaw-Owen's received her right-to-sue from the Department of Fair Housing and Employment.

# FIRST CLAIM
## DISABILITY DISCRIMINATION
### 42 U.S.C. SECTION 1201, *et seq.*

47. As a first, separate and distinct claim, Plaintiff complains of Defendant, and for a claim, alleges:

48. The Americans with Disabilities Act (ADA) makes it illegal for a covered entity to discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C.

49. At all relevant times SFSU was a covered entity subject to the Americans with Disabilities Act (ADA) as defined by 42 U.S.C. 12111(2) and employed more than 15 people at Plaintiff's work facility.

50. At relevant times Plaintiff suffered from and was diagnosed with severe health conditions which substantially impaired Plaintiff's major life functions, including but not limited to work.

51. During Plaintiff's disability and thereafter, Plaintiff became subjected to the actions and conduct as alleged above on account of disability in violation of the Americans with Disabilities Act.

52. In so doing the acts and engaging in the conduct alleged herein, Defendants and each of them intended to and did vex, harass, annoy and cause Plaintiff to suffer and continue to suffer emotional and physical distress.

53. As a direct and proximate result of the willful, knowing, and intentional discrimination against Plaintiff, and the failure to act by Defendant, Plaintiff has suffered mental distress, anguish, and indignation. Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

54. As a direct result of the acts and conduct of Defendant as alleged herein, Plaintiff has suffered loss of and continues to suffer substantial loss of earnings and related employment benefits in an amount to be proven at trial herein.

55. Plaintiff duly filed an administrative charge of disability discrimination with the California DFEH, which under the worksharing agreement with the EEOC provides for cross-filing of claims, and received a right-to-sue on January 30, 2013.

WHEREFORE, Plaintiff prays judgment as set forth below.

///

///

## SECOND CLAIM
## DISABILITY DISCRIMINATION
## CAL. GOVT. CODE SECTION 12940, *et seq.*

56. As a second, separate and distinct claim, Plaintiff complains of Defendant, and for a claim alleges:

57. The factual allegations of paragraphs 1 through 55 above are re-alleged and incorporated herein by this reference.

58. At all relevant times SFSU was a covered entity subject to the provisions of the California Fair Employment and Housing Act ("FEHA"), California Government Code Section 12940, et seq., which prohibits discrimination, among others, on account of disability.

59. At relevant times Plaintiff suffered from and was diagnosed with severe medical conditions substantially impairing her major life functions.

60. Plaintiff is therefore part of a protected class under the FEHA in that her major life functions were seriously impacted, including but not limited to the ability to work.

61. During Plaintiff's disability and thereafter, Plaintiff became subjected to the actions and conduct as alleged above on account of disability in violation of the FEHA.

62. In so doing the acts and engaging in the conduct alleged herein, Defendants and each of them intended to and did vex, harass, annoy and cause Plaintiff to suffer and continue to suffer emotional and physical distress.

63. As a direct and proximate result of the willful, knowing, and intentional discrimination against Plaintiff, and the failure to act by SFSU, Plaintiff has suffered mental distress, anguish, and indignation. Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

64. As a direct result of the acts and conduct of Defendant as alleged herein, Plaintiff has suffered loss of and continues to suffer substantial loss of earnings and related employment benefits in an amount to be proven at trial herein.

65. Plaintiff duly filed an administrative charge of disability discrimination with the DFEH. Plaintiff obtained an DFEH Right to Sue Notice on January 30, 2013.

WHEREFORE, Plaintiff prays for relief as set forth below.

## THIRD CLAIM
## FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS
## CAL. GOV. CODE SECTION 12900, et seq.

66. As a third, separate and distinct claim, Plaintiff complains of Defendant, and for a claim alleges:

67. The factual allegations of Paragraphs 1 through 65 above, are re-alleged and incorporated herein by reference.

68. Jurisdiction is invoked pursuant to Section 12965, as amended, of the Government Code of the State of California, seeking a declaratory judgment, injunctive and damages for violations of the Plaintiff employment rights as protected by FEHA, Government Code section 12900, et seq., which reserves an employee's right to a good faith investigation into whether a reasonable accommodation could be implemented.

69. Plaintiff was diagnosed with the physical disability serious medical conditions requiring surgery, which substantially limited her major life activities, among other things social activities and work, qualifying as a disability under FEHA.

70. Plaintiff SHAW-OWENS was willing to participate in an interactive process to determine whether reasonable accommodations could be made so that Plaintiff SHAW-OWENS would be able to perform the essential job functions.

71. Instead of engaging in the interactive process and providing a reasonable accommodation Defendant SFSU instead engaged in the adverse employment actions against Plaintiff as set forth above.

72. Defendant SFSU failed to participate in a timely good-faith interactive process with Plaintiff SHAW-OWENS to determine whether reasonable accommodations could be made.

73. In doing the acts and engaging in the conduct herein alleged, Defendant SFSU intended to and did vex, harass, annoy, and cause Plaintiff SHAW-OWENS to suffer and continue to suffer severe emotional distress.

74. As result of said actions and conduct of Defendant SFSU, Plaintiff SHAW-OWENS has suffered damages for loss of earnings, loss of future earnings, and related employment benefits and opportunities, anguish, and indignation. Plaintiff SHAW-OWENS is thereby entitled to general and compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FOURTH CLAIM
## FAILURE TO REASONABLY ACCOMMODATE
## CAL. GOV. CODE SECTION 12900, et seq.

75. As a fourth, separate and distinct claim, Plaintiff complains of Defendant and for a claim alleges:

76. The factual allegations of Paragraphs 1 through 74 above, are re-alleged and incorporated herein by reference.

77. Jurisdiction is invoked pursuant to Section 12965, as amended, of the Government Code of the State of California, seeking a declaratory judgment, injunctive and damages for violations of the Plaintiff employment rights as protected by FEHA, Government Code section 12900, et seq., which requires employers to make reasonable accommodations for the known physical or mental disability of an applicant or employee.

78. Plaintiff was diagnosed with the physical disability of serious medical conditions, which substantially limited major life activities, among other things social activities and work, qualifying as a disability under FEHA.

79. Instead of providing a reasonable accommodation Defendant engaged in the adverse actions set forth above concerning Plaintiff's employment status.

80. Defendant failed to determine whether reasonable accommodations could be made.

81. In doing the acts and engaging in the conduct herein alleged, Defendant intended to and did vex, harass, annoy, and cause Plaintiff to suffer and continue to suffer severe emotional distress.

82. As result of said actions and conduct of Defendant, Plaintiff has suffered damages for loss of earnings, loss of future earnings, and related employment benefits and opportunities, anguish, and indignation. Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For general damages in amounts according to proof and in no event in an amount less than the jurisdictional limit of this court;
2. For special damages in amounts according to proof;
3. For attorneys' fees as provided by law;
4. For interest as provided by law;
5. For costs of suit herein; and
6. For such other and further relief as the Court deems fair and just.

Dated: June 7, 2013

SMITH PATTEN

_____
SPENCER F. SMITH
DOW W. PATTEN
Attorneys for Plaintiff
NICOLE SHAW-OWENS

## JURY DEMAND

PLAINTIFF hereby demands trial by jury of all matters so triable.

Dated: June 7, 2013

SMITH PATTEN

_____
SPENCER F. SMITH
DOW W. PATTEN
Attorneys for Plaintiff
NICOLE SHAW-OWENS

COMPLAINT - 13